Filed 10/22/20

**CERTIFIED FOR PUBLICATION**

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GORDON EPSTEIN,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>VISION SERVICE PLAN,<br><br>     Defendant and Respondent. | A155219<br><br>(Alameda County<br>Super. Ct. No.<br>HG16812864) |

Plaintiff Gordon Epstein, an optometrist, entered into a "Network Doctor Agreement" with Vision Service Plan (VSP) to be part of its provider network. After VSP conducted an audit of Epstein's claims for reimbursement, it concluded he was knowingly purchasing lenses from an unapproved supplier and terminated the provider agreement.

As pertinent here, the agreement set forth a two-step dispute resolution procedure. The first step, entitled "Fair Hearing," (underscoring omitted) provided for an internal appeal process in accordance with the "VSP Peer Review Plan and Fair Hearing Policy." If the dispute remained unresolved, the second step, entitled "Binding Arbitration," (underscoring omitted) required arbitration pursuant to the Federal Arbitration Act (FAA) and in accordance with procedures also set forth in the referenced plan and policy.

1

Epstein invoked the first step of the dispute resolution process and appealed the audit and termination decision. A three-member panel, after conducting a hearing during which testimony and documentary evidence was presented, upheld the audit findings and termination of the agreement.

Instead of invoking the second step of the dispute resolution process and requesting arbitration, Epstein filed the instant administrative mandamus proceeding (Code Civ. Pro., § 1094.5). He alleged this was proper for two reasons. First, he maintained the second step of the dispute resolution process was contrary to state regulatory law requiring certain network provider contracts to include a procedure for prompt resolution of disputes and expressly stating arbitration "shall not be deemed" such "a provider dispute resolution mechanism." (Cal. Code Regs., tit. 28, § 1300.71.38.) He further claimed this state law was not preempted by the FAA by virtue of the McCarran-Ferguson Act, which generally exempts from federal law, state laws enacted to regulate the business of insurance. Epstein secondly maintained that, regardless of any regulatory prohibition of arbitration, the second step of the dispute resolution process was procedurally and substantively unconscionable and therefore unenforceable.

The trial court rejected both Epstein's regulatory law and unconscionability challenges to arbitration and denied his writ petition on the ground he had failed to exhaust administrative remedies because he had failed to request arbitration.

We affirm. As did the trial court, we conclude state regulatory law requiring certain network provider agreements to include a dispute resolution process that is not arbitration, pertains only to the first step of the dispute resolution process and does not foreclose the parties from agreeing to arbitration in lieu of subsequent judicial review through administrative

2

mandamus.  We also conclude that while the arbitration provision is procedurally unconscionable in minor respects, Epstein failed to establish that it is substantively unconscionable.

## I.  BACKGROUND

*The Network Doctor Agreement*

VSP is the largest vision care insurer in California, indeed, in the United States.  It provides coverage to approximately 80 million individuals.

To deliver the vision coverage promised, VSP contracts with approximately 38,000 medical providers.  Thus, when Epstein desired to become one of these providers, he and VSP entered into a "Network Doctor Agreement" (which we refer to as the "provider agreement").  (Capitalization omitted.)

As relevant here, this 14-page agreement provided for a two-step dispute resolution process, as follows:

> "**9. Fair Hearing Policy/Binding Arbitration**
>
> "a. <u>Fair Hearing</u>.  In the event of a dispute as to VSP's imposition of any applicable disciplinary action against Network Doctor, Network Doctor, for himself/herself and on behalf of any derivative associate doctor(s), may appeal such action in accordance with provisions and requirements, including the payment of fees and costs, set forth in the VSP Peer Review Plan and Fair Hearing Policy, as may be amended or replaced from time to time, and incorporated herein by reference (the 'Fair Hearing Procedure').
>
> "b. <u>Binding Arbitration</u>.  If the above process does not resolve the dispute, then, unless expressly disallowed by state law, the dissatisfied party may request final determination and resolution of the matter by mandatory binding arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. Chp. 1-3, in accordance with the Fair Hearing Procedure.  This mechanism, the initial costs of which shall be shared equally by the parties, shall be the sole method, in lieu of a jury or court trial, of resolving any permissible dispute that may arise between Network Doctor and VSP.  Any such arbitration shall (i) take place in

3

Sacramento, California and (ii) be administered by a mutually agreeable arbitrator, selected from a closed list of neutral-qualified and readily available arbitrators maintained by VSP, who may, in the arbitration award, allocate among or between the parties, all or part of the costs of arbitration, including the fees and costs of the arbitrator, including any legal counsel to the arbitrator, and the reasonable attorney's fees and costs of the prevailing party.  To the extent allowable so as not to invalidate application of the Federal Arbitration Act, this Agreement shall be governed by the laws of the state of California."

The incorporated "Fair Hearing Procedure" spelled out in detail the procedures for a step-one fair hearing and for a step-two arbitration.  With respect to arbitration, these procedures included the deadline to request arbitration after an adverse decision by a hearing panel, the initial fee for arbitration subject to reallocation by the arbitrator, the content of the notice scheduling the arbitration hearing and stating the issues to be arbitrated, the right to counsel, the arbitrator selection process, the extent of discovery, witness disclosure, attendance at the arbitration hearing, and the confidentiality attendant to the "peer review privileged and protected process."

***The Underlying Dispute***[1]

VSP requires its contracted providers to use either a VSP lab or a VSP-contracted lab to fabricate eyeglass lenses for VSP insureds.  VSP

---

[1]  This factual summary is drawn from "Stipulated Facts" filed in connection with Epstein's writ petition  and from facts VSP alleged in its verified answer to Epstein's writ petition which Epstein failed to refute either in a replication or through evidence presented at the hearing on his writ petition.  (See *Elliott v. State Contractors' License Bd.* (1990) 224 Cal.App.3d 1048, 1054 ["Factual allegations in an answer to a petition for a writ of mandate must be countervailed by proof at trial or by replication, or they are taken as true."]; see generally Cal. Judges Benchbook: Civil Proceedings-After Trial (CJER 2019) Mandate, Petitioner's Replication § 5.22.)

4

"reimburses VSP-contracted labs an agreed upon amount for eyeglass lenses fabricated . . . for a VSP member.  The contract between VSP and a lab is considered by the parties to be confidential."

Lenstek was a VSP-contracted lab until its contract was terminated in 2009.  After Lenstek's contract with VSP was terminated, Lenstek entered into an agreement with Nouveau Labs, a VSP-contracted lab, under which Lenstek would fabricate eyeglass lenses for VSP insureds whose eyeglass prescriptions were sent to Nouveau.  In short, Lenstek continued to fabricate lenses for VSP insureds, but did so indirectly through Nouveau.  VSP's "policies and procedures do not permit such an arrangement, and VSP would not have paid for the Lenstek lenses that were inaccurately billed to VSP as Nouveau product."

Epstein ordered eyeglasses on behalf of his VSP patients from Nouveau Labs.  When VSP learned of Nouveau's subcontract with Lenstek, it filed suit against Nouveau and terminated Epstein's provider contract.  VSP also demanded that Epstein pay restitution of $104,333, the amount it had paid Epstein the prior three years for claims for lenses ostensibly fabricated by Nouveau, but actually fabricated by Lenstek.

Epstein appealed in accordance with the first step of the dispute resolution process set forth in the provider agreement, and the matter was heard by a three-person panel.  Both Epstein and VSP were represented by counsel.  At the outset of the hearing, the panel chairman explained the procedures and rules.  Epstein was given an opportunity to raise procedural objections but did not voice any.  Both documentary and testimonial evidence were presented to the panel.

The hearing panel found Epstein knew Nouveau was subcontracting out the fabrication work and that the work "was actually being performed at

5

a non-contracted VSP lab, contrary to VSP policy." The panel therefore "upheld VSP's initial decision imposing restitution, terminating the [Agreement], and charging the audit fees."

Rather than proceed to the second step of the dispute resolution process—by submitting a request for arbitration—Epstein filed the instant administrative mandamus action, challenging the hearing panel's decision on several grounds.

Epstein's writ petition came on for hearing following a scheduling order issued by the trial court in its order overruling a demurrer to the petition. In addition to the administrative record, the parties filed supporting and opposing points and authorities, supporting and opposing documentation, and stipulated facts. At the close of the hearing, the trial court asked for additional briefing on whether the state regulatory law Epstein claimed invalidated the arbitration provision was preempted by the FAA or saved from preemption by virtue of the McCarran-Ferguson Act.

Following the additional briefing, the court denied Epstein's writ petition on the ground he had "failed to exhaust" his administrative remedies by failing to request arbitration. It rejected Epstein's regulatory challenge to arbitration, concluding "the VSP hearing panel proceeding and binding arbitration proceeding are separate proceedings, rather than a single process of binding arbitration." It also rejected his claim that the requirement to arbitrate an adverse decision by a hearing panel, in lieu of a judicial challenge thereto, was unconscionable.

6

## II. DISCUSSION

### A. *State Regulatory Law Prohibiting Arbitration Applies to the Step-One Fair Hearing Process, Not to the Step-Two Arbitration Process*

We first address Epstein's claim that the step-two arbitration process is prohibited by state regulatory law that survives FAA preemption by virtue of the McCarran-Ferguson Act.[2] Epstein advances this claim only after urging that the arbitration provision is unconscionable and therefore unenforceable. However, if, as Epstein claims, state law prohibits the arbitration provision, whether it is unconscionable is immaterial.

The trial court rejected Epstein's assertion that state regulatory law prohibits the step-two arbitration process, concluding Epstein was conflating the two distinct dispute resolution processes set forth in the provider agreement, and that while the step-one "Fair Hearing" process may be subject to this regulatory law, the separate, step-two arbitration process is not. Epstein fails to address this threshold, and pivotal, ruling by the trial court. Instead, he devotes his appellate briefing to urging that this regulatory law survives FAA preemption by virtue of the McCarran-Ferguson Act—an issue that is pertinent only if the regulatory prohibition on arbitration applies to step two of the dispute resolution process.

---

[2] The McCarran-Ferguson Act provides an exception to the FAA's preemptive effect in certain circumstances, namely for state statutes and regulations enacted for "regulating the business of insurance." (See generally *U.S. Dept. of Treasury v. Fabe* (1993) 508 U.S. 491, 501–505; *Union Labor Life Ins. Co. v. Pireno* (1982) 458 U.S. 119, 122, 129, abrogated in part on another ground in *Kentucky Association of Health Plans, Inc. v. Miller* (2003) 538 U.S. 329, 339–340; *Group Life & Health Ins. v. Royal Drug Co.* (1979) 440 U.S. 205, 213–214, 220–222; *Securities and Exch. Com'n v. National Securities, Inc.* (1969) 393 U.S. 453, 459–460; *Citizens of Humanity, LLC v. Applied Underwriters, Inc.* (2017) 17 Cal.App.5th 806, 815–817.)

As did the trial court, we conclude this state regulatory law does not foreclose the parties to a network provider agreement from agreeing that any *review* of a decision reached through the statutorily required fair hearing process shall be by way of binding arbitration, in lieu of judicial review by way of administrative mandamus.

The state regulatory law in question is set forth in the Health and Safety Code and its implementing regulations. Specifically, Health and Safety Code section 1367, one of the numerous statutes governing "capitated" health care plans, provides that: "Contracts with subscribers and enrollees, including group contracts, and contracts with providers, and other persons furnishing services, equipment, or facilities to or in connection with the plan, shall be fair, reasonable, and consistent with the objectives of this chapter. All contracts with providers shall contain provisions requiring a fast, fair, and cost-effective dispute resolution mechanism under which providers may submit disputes to the plan, and requiring the plan to inform its providers upon contracting with the plan, or upon change to these provisions, of the procedures for processing and resolving disputes, including the location and telephone number where information regarding disputes may be submitted." (Health & Saf. Code, § 1367, subd. (h)(1).)

The regulation implementing Health and Safety Code section 1367 similarly provides: "All health care service plans and their capitated providers that pay claims . . . shall establish a fast, fair and cost-effective dispute resolution mechanism to process and resolve contracted and non-contracted provider disputes. The plan and the plan's capitated provider may maintain separate dispute resolution mechanisms for contracted and non-contracted provider disputes and separate dispute resolution mechanisms for claims and other types of billing and contract disputes. . . ." (Cal. Code Regs.,

tit. 28, § 1300.71.38.)  It further provides:  "Arbitration shall not be deemed a provider dispute or a provider dispute resolution mechanism for the purposes of this section."  (*Ibid.*)

As the trial court recognized, Epstein's assertion that this regulatory law prohibits step two of the dispute resolution process turns on his view that the provider agreement provides for a *single* "dispute resolution mechanism" which, pursuant to state law, must be "fast, fair and cost-effective" and cannot be arbitration.  Like the trial court, we conclude this is not a fair reading of the network provider agreement.

The agreement plainly sets forth a two-step dispute resolution process, each step providing a different "dispute resolution mechanism."  The first step, an internal appeal, provides the "fast, fair and cost-effective dispute resolution mechanism" that is not arbitration, as called for by the regulatory law in question.  Nowhere in the record before us did Epstein assert otherwise.  Nor has he made such an assertion on appeal.[3]

This regulatory law does not address, let alone purport to limit, the means by which parties can *challenge* a decision rendered at the conclusion of the regulatorily required "fast, fair and cost-effective dispute resolution mechanism."  It is Epstein's view that the only means to challenge such a decision is through the courts by way of administrative mandamus.

_____

[3] The regulations set forth "minimum" requirements for this dispute resolution mechanism, including that a provider who disputes a notice for reimbursement must do so within 30 working days of receiving the notice (Cal. Code Regs*.,* tit. 28, § 1300.71, subd. (d)(4)) and the plan must "issue a written determination stating the pertinent facts and explaining the reasons for its determination within 45 working days after the date of receipt of the provider dispute or the amended provider dispute."  (*Id.*, § 1300.71.38, subd. (f).)  Otherwise, the regulations generally require the plan and provider to establish the written procedures for the required dispute resolution mechanism.  (*Id.,* § 1300.71.38, subd. (c).)

However, no statutory provision purports to make administrative mandamus the exclusive means for review of such a decision, and more to the point, no statutory provision purports to bar the parties from agreeing to binding arbitration, in lieu of judicial review through administrative mandamus.

Indeed, Epstein fails to appreciate that by pursuing an administrative mandamus action, he has, himself, acknowledged that a provider can *challenge* a decision rendered at the conclusion of the statutorily required "fast, fair and cost-effective dispute resolution mechanism." Accordingly, the salient question is whether any statutory or regulatory law purports to prohibit the parties from agreeing to binding arbitration in place of an administrative mandamus proceeding. As we have set forth above, the regulatory law Epstein invokes contains no such prohibition.

Epstein cites to an unpublished federal district court case, *Fox, O.D. v. Vision Service Plan* (E.D.Cal., Feb. 24, 2017, No. 2:16-cv-2456-JAM-DB) 2017 WL 735735, in support of his assertion that the McCarran-Ferguson Act saves the state regulatory prohibition of arbitration from FAA preemption. He does not discuss any other aspect of the district court's decision, but the court was required, of course, to preliminarily decide whether this state regulatory law applied to the VSP dispute resolution provision.

Like Epstein, the plaintiff in *Fox* was a VSP provider whose agreement was terminated after an audit. (*Fox, O.D. v. Vision Service Plan, supra,* 2017 WL 735735 at *1.) Although she appealed in accordance with step one of the dispute resolution process, when VSP scheduled a hearing she filed an action in state court, which VSP removed to federal court. (*Ibid.*) Fox claimed the entire dispute resolution process was an "arbitration" and sought to enjoin VSP from enforcing the audit on the ground it had failed to provide her the statutorily required, non-arbitration "fast, fair and cost-effective dispute

10

resolution mechanism." (*Ibid.*) The district court granted preliminary injunctive relief. (*Ibid.*)

The court concluded the step-one fair hearing process, itself, was an "arbitration" and thus was prohibited by state regulatory law. It further concluded this law was saved from FAA preemption by the McCarran-Ferguson Act. (*Fox, O.D. v. Vision Service Plan, supra,* 2017 WL 735735 at *2–4.)

With respect to its ruling that the step-one fair hearing process, itself, was an "arbitration," the district court addressed only two points. First, it concluded the dispute between Fox and VSP fell within the regulatory definition of "provider dispute." (*Fox, O.D. v. Vision Service Plan, supra,* 2017 WL 735735 at *2–3.) Second, it ruled the fact the step-one hearing process was neither binding nor immune from review, did not conclusively establish that it was not arbitration. (*Id.* at *3.) The entirety of the court's analysis as to the latter point consisted of a single sentence stating as follows: " '[A]rbitration need not be binding to fall within the scope of the [FAA].' " (*Ibid.*, quoting *Wolsey, Ltd. V. Foodmaker, Inc.* (9th Circ. 1998) 144 F.3d 1205, 1209.)

Epstein has never claimed, in either the trial court or on appeal, that the step-one fair hearing process, itself, is an impermissible arbitration. Indeed, it strikes us as counterintuitive that a provider challenging an audit and termination of his or her network contract, would claim, as Fox apparently did, that VSP was legally obligated to provide a more abbreviated and informal first level of review, with fewer (if any) formalized opportunities for the provider to gather information, and a more limited opportunity (and perhaps no right to a hearing) to present his or her case.

11

In any event, for the reasons we have discussed, we conclude the federal district court did not correctly analyze the applicable state regulatory law or the dispute resolution provisions of the VSP provider agreement. Specifically, the district court did not identify the appropriate procedural analog—i.e., that a provider (or VSP) can challenge the decision rendered at the conclusion of the mandated fair hearing process, and no state regulatory law prohibits the parties from agreeing to pursue such a challenge through arbitration, rather than through an administrative mandamus action. We therefore have no call to explore the reach of the McCarran-Ferguson Act's "business of insurance" exception to FAA preemption.

## B. *Epstein Has Not Established That the Second Step of the Dispute Resolution Process Requiring Arbitration Is Unenforceable*

Having concluded that the second step of the dispute resolution process, requiring arbitration, is not prohibited by state regulatory law, we turn to Epstein's second claim, that the arbitration requirement is unconscionable and therefore unenforceable. (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246–246 [" '[g]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening' the FAA"].)

As our Supreme Court has recently explained, a " ' "common formulation of unconscionability is that it refers to ' "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." ' [Citation.] As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly

12

harsh or one-sided results." ' " (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243 (*Baltazar*).)

" ' "The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." [Citation.]  But they need not be present in the same degree.  "Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." [Citations.]  In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " (*Baltazar, supra,* 62 Cal.4th at pp. 1243–1244, italics omitted, quoting *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*). abrogated in part on another ground in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 340–343.)

" '[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided.  [Citation.]  . . . [T]here are degrees of procedural unconscionability.  At one end of the spectrum are contracts that have been freely negotiated by roughly equal parties, in which there is no procedural unconscionability. . . .  Contracts of adhesion that involve surprise or other sharp practices lie on the other end of the spectrum.  [Citation.]  Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural

13

unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." [Citation.]' " (*Baltazar, supra,* 62 Cal.4th at p. 1244.)

" 'The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation]. All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party" [citation]. . . .' " (*Baltazar*, *supra*, 62 Cal.4th at p. 1244.) " ' "Not all one-sided contract provisions are unconscionable. . . . The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement.' " (*Id.* at p. 1245.)

### *Procedural Unconscionability*

Epstein contends the network provider agreement is afflicted with a high degree of procedural unconscionability—that it is "a classic oppressive contract of adhesion" and VSP's failure to provide him a copy of the VSP Peer Review and "Fair Hearing Procedure" at the time he executed the agreement resulted in unfair surprise. We conclude Epstein substantially overstates the degree of procedural unconscionability inuring in the agreement.

"The term 'contract of adhesion,' " " 'signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Graham v. Scissor-Tail, Inc*. (1981) 28 Cal.3d 807, 817 (*Scissor-Tail*).) Epstein maintains that VSP's size and dominance in the

14

vision care market gives it bargaining power far superior to that of any individual health care provider, resulting in an agreement that is an "essentially non-negotiable, take-it-or-leave-it proposition."

The trial court found, however, that the evidence did not support such a sweeping claim. The court cited to the deposition testimony of Dorothy Neifert, VSP's Director of Network Development , that "when we receive a request from a provider about the change [in the provider agreement] that he or she may be asking for, we'll look into it and work back with the appropriate attorneys to determine if the change must be made because, perhaps, there's been a change in state law that--that needs to be addressed." (Underscoring omitted.) If a doctor requested a change, VSP "would take a look at what the request is. If the request was something that we thought would benefit all, we would want to put it into our annual review process." Neifert was admittedly not aware of "any changes that were made as a result of a doctor requesting a change to the . . . Fair Hearing Policy," but she also was not aware of any provider making such a request. VSP also alleged in its verified answer to Epstein's writ petition that some applicants propose changes to the provider agreement, VSP always considers such a proposed change, and sometimes accepts them—facts Epstein never disputed. For his part, Epstein made no claim he did not have adequate time to review the provider agreement, or to have it reviewed by counsel, or to ask questions about or request changes to any of its provisions.

Thus, the trial court's rejection of Epstein's assertion that the VSP provider agreement is inherently a non-negotiable "take it or leave it" proposition is supported by substantial evidence. (See *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89.)

15

But that said, there is no doubt VSP's network provider agreement carries some degree of procedural unconscionability, given VSP's overwhelming presence in the vision marketplace and the fact its provider agreement is clearly a form agreement that is presented as such to applicant providers. (See *Scissor-Tail*, *supra*, 28 Cal.3d at pp. 817–819.)

Epstein also maintains there is a "high level" of procedural unconscionability because certain "arbitration procedures" were "only found in the incorporated [VSP Peer Review Plan and Fair Hearing Policy] which [was] not provided to Epstein and [was] not readily available to him." (Italics omitted.)

" ' "Numerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound, supported a finding of procedural unconscionability." ' [Citations.] As each of these cases explained, the failure to provide a copy of the governing rules 'contributes to oppression because the employee "is forced to go to another source to find out the full import of what he or she is about to sign--and must go to that effort prior to signing." ' " (*Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 244–245 (*Carbajal*), italics omitted.)

Specifically, Epstein relies on *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387, in which the court held three factors established procedural unconscionability—the employer drafted the employment agreement, the arbitration clause was a mandatory part of the agreement, and the employee was not given a copy of the AAA rules by which an arbitration would be conducted. (*Id*. at p. 393.) The court concluded "the failure to provide a copy of the arbitration rules to which the employee would be bound supported a finding of procedural unconscionability." (*Ibid*.)

16

However, in *Baltazar, supra,* 62 Cal.4th 1237, our Supreme Court rejected a like claim, based on *Trivedi*, that there was a high degree of procedural unconscionability because the employer did not provide the plaintiff a copy of the "AAA rules for arbitration of employment disputes, which, by the terms of the arbitration agreement, govern any arbitration between the parties." (*Id.* at p. 1246.) Distinguishing *Trivedi*, the high court explained "in *Trivedi* itself and in each of the Court of Appeal decisions cited therein, the plaintiff's unconscionability claim depended in some manner on the arbitration rules in question. [Citations.] These cases thus stand for the proposition that courts will more closely scrutinize the substantive unconscionability of terms that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement." (*Ibid.*) Because the plaintiff's challenge to enforcement of the arbitration provision in *Baltazar* had nothing to do with the AAA rules, the court concluded the employer's failure to attach them to the employment agreement "does not affect our consideration of Baltazar's claims of substantive unconscionability." (*Ibid.*)[4]

Here, the bulk of the arbitration procedures Epstein challenges as substantively unconscionable are summarized in the network provider agreement, itself, as well as set forth in detail in the "VSP Peer Review Plan and Fair Hearing Policy" incorporated by reference.

---

[4] *Baltazar* expressly disapproved *Trevidi* to the extent it held "simply reciting the parties' rights under [Code of Civil Procedure] section 1281.8 [to seek a temporary restraining order or preliminary injunctive relief] does not place [one party] at an unfair disadvantage," "regardless of whether [the employer] is, practically speaking, more likely to seek provisional remedies than its employees." (*Baltazar, supra,* 62 Cal.4th at p. 1248.)

As we have recited, the second step of the dispute resolution provision in the provider agreement stated a party remaining dissatisfied after an internal appeal under the first step, "may request final determination and resolution of the matter by mandatory binding arbitration, pursuant to the Federal Arbitration Act . . . in accordance with the Fair Hearing Procedure."[5] The provision went on to describe a number of procedural aspects of arbitration, including that: "the initial costs . . . shall be shared equally by the parties," the arbitration shall "take place in Sacramento, California," and it will "be administered by a mutually agreeable arbitrator, selected from a closed list of neutral-qualified and readily available arbitrators maintained by VSP." Further, the arbitrator "may, in the arbitration award, allocate among or between the parties, all or part of the costs of arbitration, including the fees and costs of the arbitrator, including any legal counsel to the arbitrator, and the reasonable attorney's fees and costs of the prevailing party." Accordingly, these procedural aspects of arbitration were expressly disclosed and, thus, not "hidden" from or in any way a "surprise" to Epstein.

In VSP's verified answer to Epstein's writ petition it additionally alleged the Fair Hearing Procedure is available to prospective network providers and to the best of its knowledge, Epstein did not ask to review a copy nor did it refuse to provide him with a copy before he signed the provider agreement. It further alleged that if a prospective network provider asks to

---

[5] In describing step one of the dispute resolution process, the provider agreement expressly spelled out that the "Fair Hearing Policy" referred to the "VSP Peer Review Plan and Fair Hearing Policy." The definitional section of the agreement further stated that "the VSP Peer Review and Fair Hearing Policy . . . is the sole dispute resolution mechanism established by VSP for determination of any and all permissible disputes, claims and/or controversies involving VSP and any Network Doctor (except any applicable state mandated claim payment dispute requirements)."

18

review the Fair Hearing Procedure or any other document incorporated by reference into the network provider agreement, VSP only requires that the provider sign a nondisclosure agreement. As we have noted, Epstein did not file a replication, nor did he present any evidence at the hearing on his writ petition to the contrary.

Epstein has not cited any case suggesting that there is heightened procedural unconscionability where the arbitration provision, itself, fairly summarizes significant procedural aspects of the arbitration and also expressly incorporates by reference a document such as the Fair Hearing Procedure that sets forth the arbitration procedures in detail and where such incorporated document is available for review on request. Epstein also makes no claim he ever asked to review the Fair Hearing Procedure or that he was not given sufficient time to do so.

Accordingly, while the network provider agreement carried with it some degree of procedural unconscionability, it was not afflicted with a "high level" of such requiring a lesser showing of substantive unconscionability to render the second step of the dispute resolution process unenforceable.

### *Substantive Unconscionability*

"A contractual provision is not substantively unconscionable simply because it provides one side a greater benefit. The party with the greater bargaining power is permitted to require contractual provisions that provide it with additional protections if there is a legitimate commercial need for those protections, but the stronger party may not require additional protections merely to maximize its advantage over the weaker party. [Citations.] 'As has been recognized " 'unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it.' " ' " (*Carbajal, supra,* 245 Cal.App.4th at p. 248.)

19

*Selection of Arbitrator*

Epstein contends the arbitrator selection process is substantively unconscionable because it "provides no assurances of neutrality at all and no way for Epstein to assess whether the arbitrators in VSP's 'closed list' [are] biased against him."

As Epstein points out, "an adhesive agreement that gives the employer the right to choose a biased arbitrator is unconscionable." (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1152, citing *Scissor–Tail, supra,* 28 Cal.3d at pp. 826–827.) Moreover, "[a] single arbitrator unilaterally selected by a contracting party adverse to the other party is presumed to be biased." (*Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp.* (2003) 111 Cal.App.4th 1328, 1341.) Likewise, an arbitration provision "will not be enforced if the designated decisional body is so associated with a party that it is presumptively biased in favor of that party." (*Id.* at p. 1340.) In short, a "neutral arbitrator requirement . . . is essential to ensuring the integrity of the arbitration process." (*Armendariz, supra,* 24 Cal.4th at p. 103.)

The network provider agreement and Fair Hearing Procedure specify the arbitrator will be selected as follows: VSP will provide "to the doctor, a closed list of potential neutral arbitrators (not to exceed five (5) persons) maintained by VSP, who have the requisite expertise and ready availability to ensure a fair arbitration. None of the listed potential arbitrators shall be in direct economic competition with the doctor, and shall stand to gain no direct financial benefit from the outcome of the arbitration." Either party to the arbitration may serve within five business days, "written objections to any proposed arbitrators, specifying in detail the factual basis for such objection. The Chair of the Quality Care Committee, in his/her sole

discretion, shall rule on any such objection.  There shall be no further right to object to the qualifications of a proposed arbitrator."  "If no written objection to any proposed arbitrator is received, or following the ruling of the Chair of the Quality Care Committee to any received objections, then each party to the arbitration shall, in writing and within five (5) business days thereafter, have the right to strike up to two (2) names from the remaining list of potential arbitrators.  The Chair of the Quality Care Committee shall then select the arbitrator from the names not stricken, unless the parties mutually agree on the arbitrator. . . ."

Thus, while the arbitrator will be selected from a closed list maintained by VSP, there are safeguards against a biased adjudicator.  The arbitrator must be neutral and cannot be in direct economic competition with the provider or stand to gain any direct financial benefit from the outcome of the arbitration.  Either party can object to any proposed arbitrator.  In addition, either party can strike up to two names from the remaining list of proposed arbitrators.  The closed list must also be of individuals who have the "requisite expertise and ready availability to ensure a fair arbitration," and the " ' "ability to choose expert adjudicators to resolve specialized disputes" ' " is a benefit of arbitration.  (*Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1059–1060 (*Ramos*).)

Epstein cites to *Magno v. The College Network, Inc.* (2016) 1 Cal.App.5th 277, in support of his assertion the arbitrator-selection procedure provides "no assurances of neutrality at all."  In that case, brought by nursing students against a for-profit, distance-learning provider, the arbitration provision stated arbitration would be held " 'before one neutral arbitrator selected by TCN, and with the consent of Buyer (and no other person), which consent shall not be unreasonably withheld,' " and that " 'TCN

21

shall notify Buyer of the arbitrator selected (for Buyer's consent) within 30 days.' " (*Id.* at pp. 281–282.) Not surprisingly, the Court of Appeal concluded this provision effectively allowed TNC, the drafter of the contract, to select the arbitrator with no meaningful opportunity for the other party to assess the fairness of the arbitrator or to insure a neutral arbitrator. (*Id.* at p. 290.) The arbitration provision additionally required the arbitration to be conducted in Indiana although the students resided in California. (*Id.* at p. 282.)

The arbitrator selection process in the network provider agreement at issue here is significantly different than the process in *Magno*. Epstein was not confronted with a single individual already selected by VSP to which he could object only for reasons deemed by VSP to constitute good cause. Rather, VSP provided Epstein with the names of five potential arbitrators, to which he had two opportunities to object. Epstein also makes no claim he or his attorney could not research the credentials and experience of these professionals, for example through an internet search.[6]

*Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, which Epstein also cites, is also readily distinguishable. In that case, the arbitrator selection provision required that the arbitrator be a Texas resident and lawyer, while the plaintiffs in the wage and hour case were California employees. (*Id.* at pp. 244, 248.) In addition, the arbitration provision mandated that Texas law applied, thus depriving the plaintiffs of the unconscionability defense provided by California law, as well as depriving

---

[6] At oral argument, Epstein's counsel claimed, without record support, that a provider would be unable to determine whether proposed arbitrators had previously served as arbitrators. And on further inquiry, he disclaimed taking the position that selecting an arbitrator from a panel of qualified professionals was *per se* substantively unconscionable.

them of employment rights and remedies under California law. (*Id.* at p. 248.)

Here, in contrast, the only restriction on the qualification of the arbitrator was that he or she be neutral, qualified, and readily available to conduct an arbitration in Sacramento and in accordance with California law. These are not remotely akin to the oppressive arbitrator-selection restrictions in *Pinela.*

The arbitrator-selection process here is also distinctly different from that in *Bakersfield College v. California Community College Athletic Assn.* (2019) 41 Cal.App.5th 753 (*Bakersfield College*), decided after the close of briefing in this appeal. The Court of Appeal, agreeing with the trial court that it was a "close case" whether the arbitration provision at issue was unconscionable, came down on the side of unconscionability and reversed the trial court's denial of the college's motion for issuance of a writ of mandate. (*Id.* at pp. 758, 760.)

*Bakersfield* involved an arbitration provision in the athletic association's constitution and bylaws, which colleges were required to adhere to in order to participate in conference athletics. (*Bakersfield College, supra,* 41 Cal.App.5th p. 757.) Collectively, this " ' "standardized" ' " contract totaled 158 pages; the arbitration provision appeared on pages 34 through 36. (*Id.* at pp. 763–764.) The colleges had no ability to negotiate any provisions of the standardized contract, the scope of arbitration was one-sided and limited to disputes member colleges, students, and employees would bring, a request for arbitration had to be filed within five days of a final adverse decision following three levels of administrative appeals, and there was no reciprocal allowance for an award of fees and costs if a college, student or employee prevailed. (*Id.* at pp. 763, 765–767.)

23

The arbitrator selection process, said the appellate court, was "another indicator" of substantive unconscionability. (*Bakersfield College, supra,* 41 Cal.App.5th at p. 768.) Three arbitrators were selected from a "preestablished 12-person master list." (*Ibid.*) The selection procedure "delineat[ed] no standards to ensure impartiality or neutrality of the candidates." (*Ibid.*) Although the constitution allowed the colleges to nominate one of the persons on the panel and specified the schools would have " 'a reasonable voice' " in the selection of other panel members, the trial court found that in actual practice " 'the entire master list was solicited, and appointed, solely by the [Athletic Association's] Executive director, with no input from member colleges.' " (*Ibid.*) The executive director not only acknowledged he never solicited input from the member colleges, but further admitted to keeping the panel list "secret." (*Id.* at p. 769.) Thus, "[i]n reality, the Athletic Association *unilaterally* selected all individuals on the master arbitration panel list and did so in secrecy, precluding the colleges from commenting on or objecting to any potentially biased member." (*Ibid.*) This, said the appellate court, did "not achieve the 'minimum levels of integrity' required to enforce an agreement to arbitrate." (*Ibid.*)

As we have discussed, the arbitrator selection process here is distinctly different and has multiple safeguards to provide the required " 'minimum levels of integrity.' " (*Bakersfield College, supra,* 41 Cal.App.5th at p. 769.) It specifies the arbitrator must be neutral and have the "requisite expertise and ready availability to ensure a fair arbitration." The arbitrator cannot be in direct competition with the provider or benefit directly from the outcome of the arbitration. Either party can object to any proposed arbitrator. And either party can strike up to two names from the remaining list of proposed arbitrators. Thus, unlike in *Bakersfield College*, the trial court here made no

24

finding that, in actual practice, VSP unilaterally selects the arbitrator without any specified fairness parameters and without any input from the provider.[7]

We therefore conclude the arbitrator selection process at issue here is not substantively unconscionable.

### *Confidentiality Provisions*

Epstein also contends confidentiality provisions unfairly favor VSP. While he does not dispute these provisions apply to both parties, he claims he is prevented from discussing the process or "what strategies worked or did not" with "others," while the impact on VSP is not as consequential because it can rely on its "institutional knowledge."

The Fair Hearing Procedure states that both steps of the dispute resolution process are "peer review privileged and protected" processes —a statement Epstein did not challenge in the trial court, nor does he do so on appeal. Both steps, in turn, have several confidentiality provisions (and

---

[7] In its briefing, without citing any authority, VSP asserted its arbitrator selection process is like the selection process used for hospital peer review. VSP is apparently referring to the statutory peer review process mandated for acute care hospitals. (Bus. & Prof. Code, § 809 et seq.; see generally *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 108–110 [discussing selection of arbitrator or individual(s) conducting peer reviewing hearing].) VSP is correct that certain of the arbitration procedures mirror the statutory requirements, such as the provision that the arbitrators or individuals conducting a peer review hearing cannot stand to gain any direct financial benefit from the outcome, they cannot have participated in the peer investigation, and they cannot be practicing in the same specialty as the provider who is subject of the peer review. (Bus. & Prof. Code, § 809.2.) However, these statutory procedures pertain to the peer review hearing conducted by the hospital, which is the equivalent of the step-one fair hearing process here, not the step-two arbitration process. Accordingly, these medical peer review statutes have no particular relevance to the issue in the instant case.

Epstein never voiced any complaint about those pertaining to the step-one fair hearing process).

Those pertaining to the second step, arbitration, state as follows:

"Protected Process. The Fair Hearing Procedure is a peer review privileged and protected process. All records, data and information acquired by or prepared for the Arbitration shall be held in strict confidence, except to the extent necessary to carry out the purposes of any final action or decision, and shall not be subject to subpoena and/or discovery, which limitations shall survive such final action or decision."

"Discovery Requests"
"All information exchanged between the parties, resulting from the hearing and/or the arbitration, shall be treated by the receiving party as strictly confidential, may be used solely in and for the purposes of the arbitration and may not be disclosed to any third party except, and subject to, such limitations as may be imposed by the arbitrator . . . . Upon completion of the dispute resolution process as provided herein, any and all confidential information, including all copies, shall be returned to the producing party following conclusion of the dispute resolution process; provided, however, this obligation shall not apply to the arbitrator or its counsel."

"Confidential Process. Due to the confidential nature of the dispute resolution process (i) the doctor may not bring spectators or other individuals to the arbitration who are not acting in a representative or testimonial capacity, (ii) the arbitrator shall have the sole right and discretion to exclude any person(s) from all or any part of the arbitration, except for a party or a party's attorney or designated representative and (iii) no record of the proceedings shall be made except as provided herein."

"Record. A party at its own expense, and the arbitrator (at the parties shared expense), may arrange for a record of the proceedings to be kept by an independent certified court reporter. . . . No other record of the proceeding of any kind may be made by any party, except for the peer review privileged and protected notes, information, materials and decision(s) of the arbitrator or designee."

26

Thus, we first observe that Epstein's challenge to the singular provision that "information acquired by or prepared for the Arbitration shall be held in strict confidence," disregards the context in which the provision appears— namely, that the parties agreed to treat the dispute resolution process as involving confidential peer review.  His challenge further disregards all the other provisions set forth in the Fair Hearing Procedure that protect the confidential nature of this process.  (Cf., *Fox v. Kramer* (2000) 22 Cal.4th 531, 539 [there is a "strong public interest in preserving the confidentiality of the medical peer review process"].)

Epstein cites no authority that suggests, in the context of arbitral review of a decision rendered in what the parties have agreed to treat as a medical peer review proceeding, that it is substantively unconscionable to require more heightened confidentiality than might be inappropriate in other contexts.

Rather, he relies on *Ramos, supra,* 28 Cal.App.5th 1042, 1046 which involved an employment dispute, wherein the plaintiff, an attorney, claimed her law firm had discriminated against her on the basis of gender.  The partner agreement contained an arbitration provision that provided in pertinent part: " 'Except to the extent necessary to enter judgment on any arbitral award, all aspects of the arbitration shall be maintained by the parties and the arbitrators in strict confidence'." (*Id*. at p. 1065.)  This court concluded the provision was unconscionable, explaining as follows:  "Because it requires [the employee] to keep 'all aspects of the arbitration' secret, she would be in violation if she attempted to informally contact or interview any witnesses outside the formal discovery process.  Further, such a limitation would not only increase [her] costs unnecessarily by requiring her to conduct depositions rather than informal interviews, it also defeats the purpose of

27

using arbitration as a simpler, more time-effective forum for resolving disputes. In addition, requiring discrimination cases be kept secret unreasonably favors the employer to the detriment of employees seeking to vindicate unwaivable statutory rights and may discourage potential plaintiffs from filing discrimination cases. We therefore conclude the provision requiring all aspects of the arbitration be maintained in strict confidence is substantively unconscionable." (*Id.* at p. 1066–1067.)

Here, the context is entirely different. The parties have agreed to treat the dispute resolution process as a confidential, medical peer review process. And VSP is not an employer, but an insurer that provides coverage for certain vision care expenses. Thus, unlike in *Ramos,* no unwaivable statutory employment rights are implicated. Moreover, the entirety of the confidentiality provisions makes it clear Epstein is not foreclosed from contacting or interviewing witnesses outside the formal discovery process.[8]

---

[8] Epstein also cites to *Pokorny v. Qixtar, Inc.* (9th Cir. 2010) 601 F.3d 987, in which the Ninth Circuit concluded a confidentiality provision "unfairly favor[ed] Quixtar because it prevent[ed] Plaintiffs from discussing their claims with other potential plaintiffs and from discovering relevant precedent to support their claims." (*Id.* at p. 1002.) However, the Ninth Circuit has since rejected *Pokorny,* explaining in *Poublon v. C.H. Robinson Co.* (9th Cir. 2017) 846 F.3d 1251, that "[t]he California Court of Appeal rejected this reasoning, holding that there is nothing unreasonable or prejudicial about 'a secrecy provision with respect to the parties themselves,' and the provision requiring confidentiality was not unconscionable." (*Id.* at p. 1266, citing *Sanchez v. Carmax Auto Superstores Cal. LLC* (2014) 224 Cal.App.4th 398, 408.)

We also note that the district court in *Fox* concluded the entire dispute resolution process in the VSP provider agreement was unconscionable (in addition to being prohibited by state regulatory law), in part because of the singular confidentiality provision challenged here by Epstein. The court considered *Pokorny's* concern about accumulated "institutional knowledge" as a matter of continuing viable concern. (*Fox, supra,* 2017 WL 735735, *7–8.) Moreover, the district court did not address the ramifications of the parties'

We therefore conclude the confidentiality provisions pertaining to arbitration are, in this context, not substantively unconscionable.

*Discovery*

Epstein additionally complains the limitations on discovery are unconscionable. Again, Epstein does not dispute these limitations apply to both parties. Instead, he claims that while he cannot "take depositions," VSP has been able to "investigate" during its audit.

Limitations on discovery apply to both the first-step appeal process (during which the evidentiary record is largely developed and about which Epstein raised no complaints) and the second-step arbitration process.

As to arbitration, the discovery provisions are as follows: Each party may request from the other, non-privileged documents within its possession or control directly relevant to the issues to be arbitrated and not previously disclosed during the step-one appeal process. Any discovery disputes are to be resolved by the arbitrator. In resolving a dispute, the arbitrator is to consider (a) the relevance of the information and the burden of producing it, (b) whether the information would violate attorney-client privilege or peer-review privilege, (c) whether the information is confidential or refers to individually identifiable doctors other than the party doctor, and (d) whether there is other good cause for production of the information. Each party may serve a request on the other party to produce any document the other party intends to offer into evidence. The parties are to serve witness lists that include the names and addresses of the witnesses. The parties are also to serve expert disclosures that include the witness's name, address, and curriculum vitae, and which attach a written report describing the expert's

agreement to treat the dispute resolution process as "a peer review privileged and protected process."

29

opinion. The parties may subsequently disclose rebuttal experts. The arbitrator can continue the hearing if necessary to accommodate the production of documents and disclosure of witnesses.

Epstein does not claim these limitations are, *per se*, substantively unconscionable. Indeed, "limitation on discovery is one important component of the 'simplicity, informality, and expedition of arbitration.'" (*Armendariz, supra,* 24 Cal.4th at p. 106, fn. 11.) And parties are "permitted to agree to something less than the full panoply of discovery provided in [the] Code of Civil Procedure. . . ." (*Id.* at pp. 105, 106, italics omitted; see *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 689–690 [limitations on discovery not substantively unconscionable].)

Rather, Epstein maintains the discovery limitations are unconscionable because during the audit process VSP "investigated" the conduct at issue and therefore obtained an unfair advantage. He cites no authority, however, suggesting that because one party has conducted an internal investigation that results in a disputed action, that renders the normal limitations on arbitral discovery unconscionable. Moreover, here, during the first step of the dispute resolution process, Epstein was not only able to conduct discovery, but he also became fully apprised of the documents and witness testimony VSP maintained supported its audit.

Accordingly, Epstein has not shown that the limitations on discovery here are substantively unconscionable.

*Time to Request Arbitration*

Epstein also challenges the time period to request arbitration, namely "within thirty (30) days following the date of receiving the hearing panel's decision." He asserts this is an unconscionable shortening of the one-year statute of limitations to initiate a billing dispute with a health plan provided

30

under California Code of Regulations, title 28, section 1300.71.38, subdivision (d)(1).

What Epstein overlooks is that this 30-day period pertains to a challenge to a decision by the hearing panel. It is analogous to the time to appeal from a judgment by the trial court, which is generally 60 days from the date of notice of entry. (Cal. Rules of Court, rule 8.104(a)(1).) He also overlooks that he is resisting arbitration in lieu of administrative mandamus, and that there is a wide range of time periods, some as short as 30 days, for challenging administrative action by way of a writ proceeding. (See generally Cal. Judges Benchbook: Civil Procedure After Trial (CJER 2019) Administrative Mandamus, Timeliness of Proceedings, § 4.22 [discussing range of time periods, including that administrative mandamus challenge to state agency action under Administrative Procedures Act is 30 days for denial of rehearing].)

As the trial court observed, Epstein has offered no reason why a party would need additional time to decide whether to accept or challenge a decision by a hearing panel. As we have discussed, at that juncture, the parties have conducted discovery during the step-one appeal process and presented their evidence in support of and in opposition to VSP's challenged action. Indeed, Epstein has not identified any additional information he supposedly needed in order to decide whether to challenge the hearing panel's decision, but which he could not have obtained within the month he had to request arbitration.

We also observe that, consistent with regulatory law (Cal. Code Regs., tit. 28, §§ 1300.71, subd. (d)(4), 1300.71.38, subd. (c)(2)), Epstein had 30 days to invoke step one of the dispute resolution process and to appeal VSP's

demand for reimbursement and cancellation of his provider contract.  Epstein does not take issue with this time period.

Accordingly, Epstein has not shown that the 30-day period to invoke step two of the dispute resolution process and request arbitration is substantively unconscionable.

*Date, Location, and Attendance at Arbitration*

Epstein further claims VSP unfairly dictates the time and place of arbitration.   The network provider agreement states, "[a]ny such arbitration shall . . . take place in Sacramento."  The Fair Hearing Policy further specifies, "arbitration shall be scheduled as soon as reasonably practicable, but not less than thirty (30) days from the date VSP received the written Request for Arbitration, unless the parties agree to another date in writing or as provided otherwise herein" and shall be held in Sacramento County.

Epstein's only complaint is that the date and place of the arbitration might be inconvenient.  In *Ramos,* we rejected a like claim. "Ramos's only complaint is that arbitration in Chicago would be inconvenient and expensive for her and more convenient for Winston.  She does not argue her claims could not be resolved in that forum or she would not receive substantial justice.  Accordingly, we conclude the provision requiring that the arbitration take place in Chicago, Illinois is not substantively unconscionable."  (*Ramos*, *supra*, 28 Cal.App.5th at p. 1067.)

Epstein also claims "[o]nly Epstein is required to attend the hearing and respond to questions" (capitalization omitted) and this supposedly one-sided attendance requirement is not only oppressive but unfairly foists on a doctor challenging a VSP decision the "burden of proof."

The Fair Hearing Procedure addresses the consequences of a provider's failure to attend a scheduled arbitration, as follows:

32

"If the doctor fails to attend and respond to questions during the arbitration, without good cause (as determined by the arbitrator, in his/her sole discretion), the doctor shall automatically forfeit the right to arbitration, the issues to be heard shall be deemed finally resolved against that party and, any adverse action(s) by VSP that were at issue in the hearing shall become the final action(s) of and an award to VSP. The award shall itself be considered an Arbitration Award for purposes of Confirming an Award under California Code of Civil Procedure (CCP) section 1285, et. seq. The party seeking confirmation of the Award shall be entitled to recover attorneys fees and costs incurred in confirming the Award. There shall be no right to appeal or other redress, including challenge in court, of this final action.

"Waivers, postponements and/or extensions of time beyond the times expressly permitted herein may be requested by the doctor, VSP, or the arbitrator or designee, and may be permitted by the arbitrator on a showing of good cause. . . . In the event of a postponed arbitration, VSP will provide the doctor with thirty (30) days advance written notice of the date of the re-scheduled arbitration."

We do not agree it is unconscionable to require a provider who has requested arbitration to attend the arbitration hearing scheduled at his or her behest, particularly since the arbitration will be in central California, the provider can request that the arbitration be postponed or rescheduled, and a failure to appear for good cause will not result in any adverse consequence.

Nor do we consider it unconscionable to impose consequences for failure to appear in the absence of having requested a continuance and the absence of good cause. Indeed, the consequences of failing to attend a scheduled arbitration are little different than the consequence that could befall a petitioner seeking administrative mandamus who fails, without leave of court or good cause, to appear for trial. The trial court could dismiss the action, leaving the challenged action in effect. (See Code of Civ. Proc., § 581, subd. (b)(5) [trial court has discretion to dismiss a complaint, without prejudice, "when either party fails to appear on the trial and the other party appears

33

and asks for dismissal"]; see *Vernon v. Great Western Bank* (1996)
51 Cal.App.4th 1007, 1012–1013 ["The failure to appear at trial was just
another variation of [plaintiff's] established theme—a total failure to
diligently prosecute her case—and no more was needed to justify the trial
court's order of dismissal."])

Nor is there merit to Epstein's assertion that the attendance provisions
unfairly place the "burden of proof" on a provider challenging a decision of the
hearing panel. The party challenging an administrative decision always has
the burden to show why the decision should be overturned. Indeed, Epstein
had the burden of proof in the instant administrative mandamus proceeding,
which he maintains he should have been able to pursue in lieu of arbitration.
(See *Paxton v. Board of Administration, Public Employee's Retirement System*
(2019) 35 Cal.App.5th 553, 559 [even where fundamental right is implicated,
a trial court " 'must afford a strong presumption of correctness concerning the
administrative findings, and the party challenging the administrative
decision bears the burden of convincing the court that the administrative
findings are contrary to the weight of the evidence' "].)

We therefore reject Epstein's assertion that the attendance
requirements are substantively unconscionable.

### *Arbitration Costs*

Epstein also maintains the provisions pertaining to the initial payment
of arbitration costs are unconscionable.

These provisions provide in pertinent part:

"The 'Request for Arbitration' must include: (i) payment of the initial
arbitration fee, if applicable. . . .
[¶]
"Each party shall pay its own legal fees and expenses, and shall pay an
equal share of the legal fees and all expenses incurred by the
Arbitrator. The VSP Optometry Director or Medical Director, or the

34

Chair of the Quality Control Committee (or their designee) shall set an arbitration fee to be paid by a party desiring arbitration, in an amount estimated to be sufficient to pay the requesting party's share of the legal fees and all expenses of the arbitrator. The arbitrator, in the final decision, may reallocate such fees and expenses for the benefit of the prevailing party."

Epstein does not dispute that these provisions apply equally to providers and VSP. Rather, he maintains that, in practice, they lack mutuality because "VSP is not required to request arbitration to enforce its audit, only Epstein is. Thus, only the doctor is likely to be the 'party desiring arbitration.'" (Italics omitted.)

Epstein again disregards that arbitration is the second step of the dispute resolution process, that either party may suffer an adverse decision by the hearing panel, and that either party may challenge that decision by means of arbitration. Thus, we are somewhat mystified by Epstein's assertion that VSP "is not required to request arbitration to enforce its audit." (Italics omitted.) Indeed, VSP is not required to "enforce" its audit through arbitration—the audit will stand on its own unless successfully challenged through the two-step dispute resolution procedure. If a provider desires to challenge an adverse audit finding, he or she must appeal in accordance with step one of the dispute resolution procedure. And if either the provider or VSP is aggrieved by the decision of the hearing panel, then either can request arbitration in accordance with step two of the dispute resolution procedure.

Furthermore, even assuming providers are more likely to be the party challenging a hearing panel decision, that does not mean that pre-payment of half of the estimated arbitration costs is per se unconscionable. Epstein did

not present any evidence that paying his estimated share was an undue hardship and thus did not carry his burden to show unconscionability. (See *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 920 [an arbitration cost provision "cannot be held unconscionable absent a showing that [arbitration] fees and costs in fact would be unaffordable or would have a substantial deterrent effect in [a plaintiff's] case"]; compare *Penilla v. Westmont Corp.* (2016) 3 Cal.App.5th 205, 218–219 [evidence showed most respondents earned less than $3,000 a month and could not afford to advance $2,500 to $5,000 per day of arbitration]; *Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1580–1582 [petitioners demonstrated substantively unconscionable where they submitted declarations showing their inability to each pay $20,000 in arbitration costs].)

In sum, Epstein has not demonstrated that any of the challenged arbitration procedures are substantively unconscionable.

## III.   DISPOSITION

The judgment is AFFIRMED.  Respondent to recover costs on appeal.

_____

Banke, J.

We concur:

_____

Margulies, P.J.

_____

Sanchez, J.

A155219, Epstein v. Vision Service Plan

37

Trial Court:Alameda County Superior Court

Trial Judge:        Hon. Kimberly E. Colwell

Counsel:

Law Offices of Craig S. Steinberg, Craig S. Steinberg, for Plaintiff and Appellant.

Hooper, Lundy & Bookman, P.C., Andrew Hardenbrook Struve, for Defendant and Respondent.